FILED

2016 Dec-13  PM 03:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **KENNETH WAYNE PATTON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 4:15-CV-540-VEH** |
| | ) |
| **JONATHAN SHADWRICK,** | ) |
| | ) |
| **Defendant**. | ) |

---

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Kenneth Wayne Patton ("Patton") initiated this civil rights case on April 1, 2015, for injuries he sustained on April 9, 2013, after being arrested and placed into custody at the Etowah County Detention Center ("ECDC"). (Doc. 1).[1] On October 8, 2015, Patton filed an amended complaint against Defendants Jonathan Shadwrick ("Shadwrick"), Scott Hassell ("Hassell"), Mike O'Bryant ("O'Bryant"), and Todd Entrekin ("Entrekin"). (Doc. 20). Defendants Hassell, O'Bryant and Entrekin filed a Motion To Dismiss on October 19, 2015 (doc. 23) and were dismissed from the action on January 5, 2016. (Doc. 27). Defendant Shadwrick's Motion To Dismiss was denied in the same Memorandum Opinion

---

[1]  Any page references to ("Doc. __") correspond with the court's CM/ECF numbering system.

and Order on January 5, 2016. (Doc. 27).

Currently pending before the court is Shadwrick's Motion for Summary Judgment (the "Motion") filed on August 22, 2016. (Doc. 37). Shadwrick filed his evidentiary materials and supporting brief on this same date. (Doc. 38). Patton opposed the Motion on September 12, 2016. (Doc. 42). Shadwrick filed his reply on September 23, 2016. (Doc. 46). Accordingly, the Motion is now under submission and, for the reasons explained below, is due to be **GRANTED IN PART** and **DENIED IN PART**.

## II.    APPLICABLE STANDARDS

### A.    Summary Judgment Generally

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510,  91 L. Ed. 2d 202 (1986). "Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to 'come forward

with specific facts showing that there is a genuine issue for trial.'" *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1274 (11th Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

Finally "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp*, 456 F.3d at 1274 (citing *Martin v. Alamo Community College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003)).

### B.    Qualified Immunity

Shadwrick asserts that qualified immunity bars Patton's federal claims brought against him. (Doc. 38 at 21). "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks omitted) (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003)). "To receive qualified immunity, a government official first must prove that he was acting within his discretionary authority." *Id*.

3

This is a two-part test. Under the first step, "the defendant must [prove that he or she was] performing a function that, *but for* the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004)(emphasis in original). Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1266. "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

Until 2009, the Supreme Court had required a two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). Under the *Saucier* test, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513,153 L. Ed. 2d 666 (2002).

If, under the plaintiff's allegations, the defendant would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). The "clearly established" requirement is designed to assure

4

that officers have fair notice of the conduct which is proscribed. *Hope*, 536 U.S. at 739, 122 S. Ct. at 2515. This second inquiry ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158.

The "unlawfulness must be apparent" under preexisting law.[2] *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 344-45, 106 S. Ct. 1092, 1097-98, 89 L. Ed. 2d 271 (1986)). Therefore, a temporal requirement exists related to this inquiry. More particularly, a plaintiff must show that a reasonable public officer would not have believed his actions to be lawful in light of law that was clearly established at the time of the purported violation. *See Anderson*, 483 U.S. at 639,107 S. Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action[,] assessed in light of the legal rules that were 'clearly established' <u>at the time</u> it was taken[.]") (emphasis added) (citation omitted); *Brosseau v. Haugen*, 543 U.S. 194, 198, 125

---

[2]  Only Supreme Court, Eleventh Circuit, and Alabama Supreme Court cases can "clearly establish" the law in this litigation.  *See Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose." (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir. 1996))).

S. Ct. 596, 599, 160 L. Ed. 2d 583 (2004) ("If the law <u>at that time</u> did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.") (emphasis added); *Brosseau*, 543 U.S. at 198, 125 S. Ct. at 599 ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law <u>at the time</u> of the conduct.") (emphasis added).

However, the *Saucier* framework was made non-mandatory by the Supreme Court in *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009), in which the Court concluded that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." Thus, "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

## III.   FACTUAL BACKGROUND[3]

On April 9, 2013, Etowah County deputy sheriffs arrested Patton on charges

---

[3] This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

of domestic violence and then transported him to the ECDC. AF No. 1.[4]

Corrections Officer Shadwrick was working the 6:00 p.m. to 6:00 a.m. shift at the

jail and was assigned to the booking room along with Corrections Officer Karen

Cook ("Officer Cook"). AF No. 2. Shadwrick had been employed at the ECDC as

a detention deputy since March 2012. AAF No. 2.[5,6]

---

[4]  The designation "AF" stands for admitted fact and indicates a fact offered by Shadwrick that Patton has admitted in his written submissions on summary judgment, in his deposition testimony, or by virtue of any other evidence offered in support of his case. Under Appendix II of the court's uniform initial order (Doc. 2) entered on April 1, 2015, "[a]ll statements of fact must be supported by specific reference to evidentiary submissions." (*Id.* at 16). For Patton, more specifically, this means that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (*Id.* at 17). Consequently, whenever Patton has inadequately asserted a dispute over a fact that Shadwrick has otherwise substantiated with an evidentiary citation, the court has reviewed the cited evidence and, if it in fact fairly supports Shadwrick's factual assertion, has accepted Shadwrick's fact. On the other hand, whenever Patton has adequately disputed a fact offered by Shadwrick, the court has reviewed the evidence cited by Patton and, if it in fact fairly supports Patton's factual assertion, has accepted Patton's version. The court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of Shadwrick's statement of undisputed facts as set forth in Doc. 38 and responded to by Patton in Doc. 42. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 1.2) would indicate the second sentence of paragraph 1 of Shadwrick's facts is the subject of the court's citation to the record.

[5]  In his Response (doc. 42) to Shadwrick's Motion for Summary Judgment (doc. 37), Patton proffered fifty-three additional undisputed facts. Shadwrick did not dispute any of these additional proffered facts in his Reply brief (doc. 46). Therefore, these facts are also deemed to be admitted in accordance with Appendix II of the Court's Uniform Initial Order. The court's numbering of these additional admitted facts (*e.g.*, AAF No. 1) corresponds to the numbering of the facts as set forth in Patton's Response brief (doc. 42).

[6]  Patton has offered additional facts regarding Shadwrick's termination from employment at the ECDC in September 2015. However, since his termination occurred more than two years after the incident which gave rise to this litigation, the court has deemed these facts irrelevant for the purposes of this analysis. *See* AAF Nos. 3, 4.

Shadwrick's contact with Patton started in the report room, a separate area from the booking room, where Shadwrick took Patton's medical history. AF No. 3. In the report room, Shadwrick warned Patton about his use of profanity when he cursed at the arresting officer and in front of the intake nurse. AF No. 4. Shadwrick testified that he overheard Patton have an outburst of profanity directed towards another deputy, an arresting officer, in the report room. AF No. 5; (Doc. 38-2 at 51:4-8).

Patton told Officer Shadwrick twice that he was a corrections officer for St. Clair Correctional Facility and that he could not be in general population. AF No. 6; AAF No. 5. As of the date of his deposition in April 2016, Patton had been employed at St. Clair Correctional Facility for 13 years. AAF No. 1. Patton testified that he told Shadwrick he did not want to go into general population and wanted to go to a single cell, fearing that the other inmates would recognize and harm him. AAF No. 6. He also testified that he told Shadwrick he had been hospitalized with cysts in his stomach. AAF No. 8. Shadwrick testified that he understood this information to mean that Patton could not be placed in the general population housing unit, not that he needed to be segregated from all inmates. AF.

No. 7.[7]   Shadwrick did not seek advice from his superiors on how to respond to
Patton's request for segregation. AAF No. 7.

ECDC polices and procedures contain guidance for placing inmates in
administrative segregation. AF No. 86. "Administrative segregation is a non-
punitive form of separation from the general population used when the continued
presence of the detainee in the general population would pose a threat to self, staff,
other detainees, property, or the security or orderly operation of the facility." AF
No. 87. Administrative segregation status includes detainees who require
protective custody, those who are holdovers en route to another facility, and those
who require separation for medical reasons. AAF No. 10; (Doc. 38-13 at 2).
According to ECDC Policy, "A detainee requires protection.  Protective custody
(PC) may be initiated at the detainee's requests . . . . [such as] 'Detainees who seek
protection claiming to be former law enforcement officers or to have held a
sensitive law enforcement position, whether or not there is official information to
verify the claim.'" AF No. 88. Shadwrick was trained on ECDC's policy regarding

---

[7]   The ECDC policy on Administrative Segregation "does not distinguish between
inmates/detainees in holding cells versus other inmates in the facility." (Doc. 42 at 2, ¶ 7); (Doc.
38-13). The policy also states that, except when exigent circumstances make it impracticable, "a
written order shall be completed and approved by a supervisory officer before a detainee is
placed in administrative segregation," and the Officer in Charge (OIC) shall "complete the
Administrative Segregation Order, detailing the reasons for placing a detainee in administrative
segregation, before actual placement." (Doc. 38-13 at 4).

Administrative Segregation. AAF No. 9.

Shadwrick sat at the desk and began booking Patton into the jail. AF No. 9.1. Shadwrick asked Patton questions and then entered his responses. AF No. 9.2. During the booking process, Patton stood on the other side of the desk facing Shadwrick with his hands on the counter. AF No. 10. Eventually, two inmate workers, Denzel Beck ("Beck") and Henry Kicklighter ("Kicklighter") entered the booking room and occupied the area just behind where Shadwrick sat. AF. No 11. As inmate workers, Beck and Kicklighter would perform duties such as laundry and cleaning the intake area, booking area, hallways, and laundry area. AF. No. 12.  Patton recognized Beck, whom Patton knew from a marriage to one of his cousins.[8] AF No. 13. Although it had been some time since they had seen each other, Patton and Beck had apparently never gotten along well. AF. No. 14.

Patton looked in Beck and Kicklighter's direction, who were both seated behind Shadwrick, and said, "What are you looking at f*** boy?" AF No. 15. Shadwrick heard the outburst of profanity and believed that Patton's outburst of profanity was directed toward Beck and Kicklighter rather than him. AF No. 16;

_____

[8]  Beck stated during the internal review of the altercation that Patton had directed the vulgarity at him and that Patton was his ex-wife's cousin. AF No. 96;(Doc. 38-10 at 3, ¶ 12). Although it could not be substantiated, the investigation also suggested that there may have been some type of extra marital history between the two men. AF No. 97; (Doc. 38-10 at 3, ¶ 13).

AAF No. 11. At deposition, Patton agreed that his outburst was directed at the inmates rather than at Shadwrick. AF No. 17.

Shadwrick did not hear Beck or Kicklighter say anything in response to Patton's outburst. AF No. 18. On video,[9] neither inmate Beck nor Kicklighter appeared to react to Patton's outburst and remained seated until Patton was placed into the holding cell. AF No. 19. Shadwrick looked up at Patton and told him to watch his language and that he had already "told him about his language and his attitude" and then said, "it was starting to piss me off." AAF No. 12; AF Nos. 20, 21.[10] Patton testified that he believed Shadwrick was aggravated with him. AAF No. 13.

The booking area had seven holding cells and two larger bullpen-type cells. AF No. 29, 71. All holding cells other than Holding cell 2, which was reserved as a female holding cell, were full at the time that Shadwrick booked Patton into the jail. AF No. 30.[11] Shadwrick testified that Patton was placed in Holding cell 7

---

[9]  Shadwrick has conventionally filed with the court an audio/video copy of his booking on CD-Rom. (Doc. 38-1). This CD-Rom includes 3 different jail videos on Channels 3, 4, 5. Accordingly, all future references to segments from these videos will include the CM/ECF number, the video channel (CH) number(s), and the relevant time segment.

[10]  Patton asserts that the jail video shows Shadwrick get visibly angry and have an outburst directed towards Patton. AAF No. 25; (Doc. 38-1, Channel 3 at 20:38:56).

[11]  According to ECDC cell assignment history, at the time of the incident the holding cells were occupied as follows: Holding cell 2 was unoccupied but was reserved as a female holding cell. AF No. 72, 73. Holding cell 3 contained an individual who was charged with capital

because it was the only place that had room. AAF No. 14. Shadwrick opened the door to Holding cell 7 and Patton entered without incident. AF No. 22.1. Shadwrick closed the cell door, walked away momentarily, and then returned to his seat behind the desk. AF No. 22.2.

At the time Patton was placed in Holding cell 7, the cell was occupied by inmate Moses Reyes ("Reyes"), who had been brought in earlier that evening. AF No. 23. At deposition, Shadwrick testified that he was familiar with inmate Moses Reyes based on prior incarcerations and knew that Reyes would sometimes get into trouble.  AF No. 25. He testified that he knew that Reyes had been in trouble "a few times" while an inmate at the ECDC, but at his deposition he could not remember exactly what the incidents were and stated that he was aware of only one previous altercation involving Reyes and another inmate. AF Nos. 26, 27; AAF No. 23.

In support of his Motion for Summary Judgment, Shadwrick entered Moses Reyes' past incident reports into evidence. (Doc. 38-12). These reports describe the following incidents:

---

murder. AF No. 74. Holding cell 6 contained an individual who was a known security risk. AF No. 75. Holding cell 7 contained Moses Reyes who had been arrested on drug-related charges. AF. No. 76. Holding cell 8 contained an individual who had been placed in a holding cell for medical reasons. AF No. 77. Isolation Holding cell 1 contained a mentally ill individual charged with capital murder. AF No. 78. Isolation Holding cell 2 contained a mentally ill individual. AF No. 79.

- On January 1, 2013, the SOD team responded to Reyes' refusal to obey orders to return to his cell for lock down. AF No. 65; AAF No. 22; (Doc. 38-12 at 21-22).

- On October 19, 2012,[12] Reyes and another inmate were observed fighting. A code red was called and the SOD team, which included Officer Shadwick and two other deputies, responded. AF No. 66; AAF No. 16; (Doc. 38-12 at 2-3).[13]

- On May 1, 2012, a code blue was called and the SOD team and nurses responded when Reyes cut his arm with a razor blade that was later found in his cell. Reyes' injury required that he be sent to the hospital for stitches. AF No. 67; AAF No. 21 (Doc. 38-12 at 17-20).

- On March 21, 2012, a code yellow was called when Reyes refused orders to hang up a telephone and return to his cell for lockdown after learning his mother had passed away. Reyes became combative and resisted a deputy. After being restrained with a minimal amount of force, Reyes was brought to booking and put in a holding cell. AF No. 68; AAF No. 20; (Doc. 38-12 at 11-16).

- On December 31, 2011, a tattoo pen and ink were recovered from Reyes's cell. AF No. 69; AAF No. 18; (Doc. 38-12 at 6).

- On December 30, 2011, Reyes and his cellmate screamed and

---

[12]  Defendant Shadwick incorrectly lists this incident as occurring on September 19, 2012. The correct date is October 19, 2012. (Doc. 38-12 at 2-3).

[13]  Shadwick stated in his deposition that Reyes was not the instigator of the inmate-on-inmate violence and was merely defending himself on October 19, 2012. (Doc 38-2 at 62:15-20). Shadwick based this claim on a statement allegedly made by another officer that the other inmate jumped on Reyes. (Doc. 38-2 at 63:2-5). However, Shadwick was not himself present at the outset of the fight on October 19, 2012, and he has not provided evidence of another officer's statement to substantiate his claim. The incident report from October 19, 2012, does not describe who started the altercation. (Doc. 38-12 at 2). Accordingly, the court disregards Shadwick's inadmissible hearsay statement.

beat on the vent and door of their cell, making a loud commotion
and continuing to do so despite orders to stop. AF No. 70; AAF
No. 17; (Doc. 38-12 at 5).

After placing Patton with Reyes in Holding cell 7, Shadwrick returned to his

desk and continued the booking process on the computer, such as entering the

charges and placing an entry into the daily committed report. AF No. 31. On

video, as Shadwrick worked at his desk, Beck stood up, looked in Holding cell 7

as he walked past, and then got a drink at a water fountain next to the cell. AF No.

32. As Beck returned back to his seat, he looked toward Holding cell 7, nodded,

and then continued walking back to his chair. AF No. 33. As he walked away,

Beck pointed at the holding cell while Shadwrick continued to work at the desk.

AF No. 34. Beck sat back down in the chair behind Officer Shadwrick. AF No. 35.

As Officer Shadwrick continued looking forward at the computer screen,

Beck quickly made hand gestures in the direction of Holding cell 7 in what

appeared to be a message to Reyes to assault Patton. AF No. 36, 98. Beck's hand

gestures occurred behind Officer Shadwrick's back while he faced the other

direction. AF No. 37. At his deposition, Shadwrick testified that he did not see

Beck give any hand signals to Reyes. AF No. 38.[14]

---

[14]  While Patton claims the jail video shows that Beck was in Shadwrick's line of sight
when Beck pointed towards Holding cell 7, the video evidence does not show that Shadwrick
reacted or responded in any way that would indicate he acknowledged or even noticed Beck's

At his deposition, Patton likewise testified that he did not see Beck give any hand signals to Reyes, and having seen the jail video, agreed Beck was sneaky about the hand signals. AF No. 39. On video, Beck stood up from his chair and both Beck and Kicklighter began looking toward Holding cell 7.  AF No. 40. As Shadwrick continued working at his desk, Beck and Kicklighter remained focused on the holding cell. AF No. 41. Beck and Kicklighter then reacted to something. AF No. 42. Reyes hit Patton in the nose, causing him to fall back against the door, which caused a loud noise. AF No. 44; AAF No. 48.[15]

According to his narrative summary of the incident, Shadwrick "heard what appeared to be a verbal argument in Holding Cell #7" at some point in time between when he put Patton in the holding cell and when he stood up and looked

---

hand signals. AAF No. 31; (Doc. 42 at 3, ¶ 38); (Doc. 38-1, Channel 4, at 20:40:04).

[15]  In his narrative summary of the incident, Reyes wrote that Patton started the fight. (Doc. 38-10 at 4, ¶ 20). Shadwrick offers this assertion as an admitted fact. AF No. 104. Patton disputes this fact as inadmissible hearsay and cites to his own testimony at deposition that Reyes suddenly attached him without warning as soon as the cell door closed. (Doc. 42 at 5, ¶ 104); (Doc. 38-3 at 43:4-20). Accordingly, the court will not consider this specific evidence in the context of the Motion for Summary Judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999) (stating that hearsay evidence may not be considered on summary judgment unless it can be "reduced to admissible form"). Regardless, it does not matter whether Reyes's statements are inadmissible hearsay because, even taking them into consideration, they are not probative of the question at hand: whether Shadwrick was subjectively aware of a substantial risk to Patton. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1333 n.2 (11th Cir. 2013).

in the direction of the cell. AF No. 28; (Doc. 38-11 at 10).[16] Shadwrick and Officer Cook suddenly stood up and looked in the direction of the holding cell. AF No. 45; AAF Nos. 27, 28, 29, 33. At deposition, Shadwrick testified that he heard a bump sound and then heard one of the inmate workers say "they're fighting." AF No. 46.1 (Doc. 38-2 at 65:2-10). He then stood up to look through the window of the cell. AF No. 46.2; AAF Nos. 34, 35, 49. Shadwrick called a "Code Red" into his radio. AF No. 47.

At Section III, Subsection A, the ECDC Policy and Procedure on Use of Force states, "When a detainee acts violently or appears on the verge of violent actions, if necessary, staff shall use reasonable force and/or restrains to prevent him/her from harming self, others, and/or property." AAF No. 50; (Doc. 43-2 at 2). Shadwrick testified that, in the event a fight breaks out between two inmates, he was trained to assess the situation, call a "Code Red," advise the responding deputies on the situation, wait until the Special Operations Detail ("SOD") team arrives, and then provide assistance as needed. AF No. 48; (Doc. 38-2 at 20-24). He further testified that once a "Code Red" is called, SOD officers respond and take control of the situation. AF No. 49; (Doc. 38-2 at 20-24).

---

[16]   Patton asserts that the jail video shows that Shadwrick does not check on Patton after placing him in the cell with Reyes. AAF No. 29 (citing Doc. 38-1, Channel 4 at 20:39:16).

16

According to Detention Center Administrator Scott Hassell, Shadwrick quickly responded to the altercation by calling a "Code Red," which caused the SOD team to arrive and respond to the incident. AF Nos. 80, 93; (Doc. 38-10 at 4, ¶¶ 9,24).  The SOD is a two-man team that works around the clock to respond to emergencies and incidents within the ECDC. AF No. 81. SOD officers have special training that allows them to handle such situations in a safe and appropriate manner. AF No. 82. The SOD team can generally respond to any location in the facility in three minutes or less. AF No. 83.

Accordingly to Hassell, ECDC correction officers are taught that if they observe an altercation within a cell, their first priority is to call a Code Red and then secure the scene as such fights are commonly a ruse to get an officer to open the cell door to facilitate an escape. AF No. 84; (Doc. 38-10 at 4, ¶28). The security risk from such ruses is greater during the night shift, which runs 6:00 pm to 6:00 a.m., as there are fewer correctional officers on duty than during the day shift. AF No. 85; (Doc. 38-10 at 5, ¶29).

Shadwrick went to the holding cell door. AF No. 50. At his deposition, Shadwrick testified that through the cell window he could see Reyes standing over Patton and hitting him while Patton covered his head with his arms and did not fight back. AF No. 51; AAF No. 53. Inmate Beck walked over to Kicklighter and

17

gave him a fist bump as Shadwrick faced the other direction looking into the cell. AF Nos. 52, 100. Shadwrick waited and watched the altercation between Patton and Reyes before he heard the buzzer signaling that the SOD team had arrived. AF No. 53; (Doc. 38-1, Channel 4 at 20:41:33 to 20:42:16).[17] Shadwrick was carrying pepper spray, which he shook up. AAF No. 36, 51. He testified that did not use the pepper spray to stop the beating because "that's two inmates, and I'm one deputy." AAF No. 52.

Shadwrick realized there was another inmate on the phone in the booking room and went to assist the other corrections officers in placing him in a holding cell. AF No. 54. Shadwrick saw the SOD officers coming through the sally port and ran to the security door to let the officers into the booking room.  AF No. 55; AAF No. 41. Once the SOD officers were in the booking area, Officer Shadwrick rushed to meet them at the holding cell door. AF No. 56. Officer Shadwrick opened the cell door for the SOD officers on their command. AF No. 57; AAF No. 42. The SOD officers entered and separated Patton and Reyes. AF No. 58. The SOD officers removed Patton from the cell and told him to sit on a chair until medical arrived. AF No. 59.

---

[17]    Patton asserts that the jail video shows Shadwrick make some small kicking movements towards the door of Holding cell 7. AAF No. 40 (citing Doc. 38-1, Channel 4 at 20:42:05).

18

Medical staff arrived to assess Patton's injuries. AF No. 60. Patton was then taken to Riverview Regional Medical Center for treatment and later returned to the detention center. AF No. 61. A search of Holding cell 7 revealed a cell phone case which was removed from the cell. AF No. 62. During the attack, Patton suffered a broken nose, a cut over the left eye, a concussion, and two broken teeth. AF No. 63.

Under ECDC policy and procedure, any time there is a use of force or any incident that requires medical treatment for an inmate, an internal review is conducted into the situation. AF No. 89. Pursuant to procedure, such a review was conducted into the incident by Captain Shane Hartley, who then provided his findings to Detention Center Administrator Hassell. AF No. 90. The review included viewing the video of the booking room, interviewing involved parties, and taking their written statements. AF No. 91.

Review of the video and conversations with those involved revealed that the altercation was likely initiated, or at the least encouraged, by inmate worker Denzil Beck, who was in the booking room when Patton was placed into Holding cell 7. AF No. 94. Beck denied any involvement, and Kicklighter denied any knowledge of Beck initiating the fight. AF Nos. 101,102. Beck was ultimately disciplined for his involvement in possibly instigating the fight. AF No. 103.

19

The investigation also revealed that Patton had identified himself as a corrections officer to Officer Shadwrick.  AF No. 105. Administrator Hassel counseled Officer Shadwrick on the importance of constant monitoring and securing of all inmate workers under his charge. AF No. 106; AAF No. 32.

## IV.   ANALYSIS

Count One of Patton's Amended Complaint (doc. 20) asserts a deliberate indifference claim against Shadwrick pursuant to 42 U.S.C. § 1983.[18],[19] Patton makes three primary arguments that Shadwrick acted with deliberate indifference. First, Patton argues that he faced a substantial risk of serious harm when he was placed in a cell with another inmate, despite multiple requests for segregation due to his employment as a corrections officer. Second, Patton argues that his placement in a holding cell with a known violent inmate, who had previously been involved in an inmate-on-inmate altercation, constituted a substantial risk of

---

[18]   As a result of this court's prior ruling (doc. 27), Count One is the only claim now pending.

[19]   Section 1983 provides a vehicle for bringing claims for constitutional violations committed under color of state law. To survive summary judgment on his § 1983 claim, Patton must demonstrate both that Shadwrick deprived him of a right secured under the United States Constitution or federal law and that the deprivation occurred under color of state law. *Arrington v. Cobb Cnty.*, 139 F.3d 865, 872 (11th Cir. 1998). "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." *Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). There is no dispute that Shadwrick acted under color of state law. Instead, the focus on summary judgment is whether Patton has adduced sufficient evidence from which a reasonable jury could conclude that Shadwrick acted with deliberate indifference in his placement of Patton in the same cell block as Reyes.

20

serious harm. Third, Patton argues that Shadwrick acted with deliberate

indifference by waiting for the SOD team to intervene in the altercation after he

called the "Code Red."

As the Eleventh Circuit has explained:

> Prison officials have an obligation to protect prisoners from violence
> inflicted upon them by other prisoners. "It is not, however, every injury
> suffered by one prisoner at the hands of another that translates into
> constitutional liability for prison officials responsible for the victim's
> safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977,
> 128 L. Ed. 2d 811 (1994). Prison officials must "take reasonable
> measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468
> U.S. 517, 526-27, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984). Only
> "[a] prison official's deliberate indifference to a known, substantial risk
> of serious harm to an inmate violates the Eighth Amendment." *Marsh v.
> Butler Cnty., Ala.*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).[20]

*Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

> A prison official violates the Eighth Amendment "when a substantial
> risk of serious harm, of which the official is subjectively aware, exists
> and the official does not respond reasonably to the risk." *Carter v.
> Galloway*, 352 F.3d 1346, 1349 (11th Cir.2003) (internal quotation

---

[20] Patton's Amended Complaint (doc. 20) invoked both the Eighth and Fourteenth
Amendments. Where the inmate is merely detained pretrial, rather than pursuant to a lawful
sentence, it is the Fourteenth Amendment, rather than the Eighth, that provides protection for the
prisoner against deliberate indifference by prison officials to a substantial risk of bodily harm.
*Compare Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003) (pretrial and Fourteenth
Amendment), *with Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (post-conviction and Eighth
Amendment). Accordingly, the Fourteenth Amendment governs Patton's claims. That conclusion
makes little difference to the analysis on summary judgment, however, because "the standard for
providing basic human needs to those incarcerated or in detention is the same under both the
Eighth and Fourteenth Amendments . . . ." *Marsh v. Butler County*, 268 F.3d 1014, 1024 n. 5
(11th Cir. 2001).

marks omitted) (alterations adopted) (emphasis added); see also *Farmer*, 511 U.S. at 828, 114 S.Ct. at 1974 ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."). To survive summary judgment on a deliberate indifference failure-to-protect claim, "a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir.2013) (internal quotation marks omitted).

When examining the first element—a substantial risk of serious harm—the court uses an objective standard. See *Marsh v. Butler Cnty.*, Ala., 268 F.3d 1014, 1028–29 (11th Cir.2001) (en banc), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The second element—the defendant's deliberate indifference to that risk—has two components: one subjective and one objective. To satisfy the subjective component, a plaintiff must produce evidence that the defendant "actually (subjectively) kn[ew] that an inmate [faced] a substantial risk of serious harm." *Rodriguez*, 508 F.3d at 617 (citing *Farmer*, 511 U.S. at 829, 837, 844, 114 S.Ct. at 1974, 1979, 1982–83, and other cases) (footnote omitted). To satisfy the objective component, a plaintiff must produce evidence that the defendant "disregard[ed] that known risk by failing to respond to it in an (objectively) reasonable manner." *Id.*

With regard to the subjective component of the second element—i.e., the defendant's actual knowledge that an inmate faced a substantial risk of serious harm—the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Rodriguez*, 508 F.3d at 617 (quoting *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981) (quotation marks omitted).

*Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099-1100 (11th Cir. 2014).

With respect to evaluating a defendant's failure to act, the "known risk of injury must be 'a strong likelihood, rather than a mere possibility.'" *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (citing *Edwards v. Gilbert*, 867 F.2d 1271, 1276 (11th Cir. 1989)). Additionally, the Eleventh Circuit has "stress[ed] that 'a prison custodian is not the guarantor of a prisoner's safety.'" *Purcell ex rel. Estate of Morgan v. Toombs County, Ga*, 400 F.3d 1313, 1321 (11th Cir. 2005) (quoting *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)).

The Eleventh Circuit has recognized, however, that inmate-on-inmate violence can amount to serious harm. *Scott v. Miami Dade County*, 2016 WL 4073246 (11th Cir. Aug. 1, 2016) (unpublished)(citing *Purcell ex rel. Estate of Morgan*, 400 F.3d at 1320 ("We accept that an excessive risk of inmate-on-inmate violence at a jail creates a substantial risk of serious harm.")).[21] In order to succeed on his deliberate indifference claim, Patton must first establish that the risk of serious harm was substantial.

To satisfy the subjective component of the second element of a deliberate indifference claim, a plaintiff must allege facts that would allow a jury to conclude that the defendant actually knew that the plaintiff faced a substantial risk of

---

[21]   In the Eleventh Circuit, unpublished decisions are not binding precedent, but they may be cited as persuasive authority. 11th Cir. R. 36-2.

serious harm. *See Caldwell*, 718 F.3d at 1099. However, a jury does not have to infer that the defendants *"intended"* or "actually *believed*" that an inmate would harm the plaintiff; rather, "it is enough that a jury be able to infer from the evidence that the defendants actually knew of a *substantial risk* that another inmate would *seriously harm* the plaintiff." *Id.* at 1102 (emphases in original). To satisfy the objective component, the plaintiff must provide evidence that the defendant failed to respond to the substantial risk in an objectively reasonable manner. *Id.*

The third requirement for a Section 1983 deliberate indifference claim to succeed is that the plaintiff demonstrate a causal connection between the prison official's conduct and the constitutional violation. As previously stated, a prison official may be liable only if he "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847, 114 S.Ct. 1970, 1984 (1994).

The critical question for the causation analysis is whether the defendant was "in a position to take steps that could have averted" the incident through his "duties, discretion and means" but, through his deliberate indifference, failed to do so. *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 622 (11th Cir. 2007)(citing *Williams v. Bennett*, 689 F.2d 1370, 1384 (11th Cir. 1982); *see also*

24

*Id.* at 622-23 (citing *LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993) ("[A] plaintiff demonstrates the 'necessary causal link' in this context where he is able to show that the prison official (1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence,' and (3) had 'other means [ ] available to him which he nevertheless disregarded.").

The Eleventh Circuit in *Rodriguez* took into consideration that the facility "had an established protocol for handling an inmate's life-threatening security concerns - immediate administrative segregation, combined with a thorough protective management review" when it concluded that the prison official had other means available to him that he "nevertheless disregarded and that those means were means that could have averted the substantial risk of serious harm facing [the plaintiff]." *Id.* at 623 (internal citations omitted).

### A.   ***Shadwick's Failure to Segregate Patton***

Patton's first two deliberate indifference arguments relate to Shadwick's failure to segregate Patton. Because the same analysis informs this court's discussion of both these arguments, the court will discuss them together. In order to prevail on either of his claims based on Shadwick's failure to segregate him, Patton must initially show that Shadwick possessed more than a "generalized

25

awareness of risk" to Patton. *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003). Ultimately, the court concludes that Shadwrick's Motion for Summary Judgment is due to be **GRANTED** as to Patton's deliberate indifference claim based on Shadwrick's failure to <u>totally</u> segregate Patton from all other inmates. However, Shadwrick's Motion for Summary Judgment is due to be **DENIED** as to Patton's deliberate indifference claim based on Shadwrick's placement of Patton in a holding cell with Reyes, an inmate that Shadwrick knew had been involved in inmate-on-inmate violence.

The undisputed material facts in this case are similarly situated to those in *Caldwell* and in *Scott v. Miami Dade County*, 2016 WL 4073246 (11th Cir. Aug. 1, 2016)(unpublished) ("*Miami Dade*"). In *Caldwell*, the plaintiff was also involved in an inmate-on-inmate assault. The plaintiff presented evidence that he feared for his health and safety because his cellmate, who had a history of violence and disruption, used the personal belongings of the plaintiff to start a fire. *Id.* at 1100, 1101. The plaintiff also presented evidence that, after the fire but before he was returned to his cell, defendants were made aware of the fire and of the plaintiff's concern for his safety. *Id.* at 1101. The Eleventh Circuit concluded that "a reasonable jury could infer from these facts that the defendants actually knew that [the plaintiff] faces a substantial risk of serious harm." *Id.*

26

In *Miami Dade*, the plaintiff similarly alleged that he informed the defendants that he "feared for his safety if he was not kept separate from other inmates." 2016 WL 4073246 at *5. On multiple occasions, the plaintiff filed written and verbal grievances that he feared assault from former gang members and requested that he be kept "separate from all inmates at all times." *Id.* at *1. However, on one occasion, the plaintiff was transported to the courthouse for an appearance and was temporarily placed in a holding cell with an inmate who had previously threatened him. *Id.* Despite re-informing an officer that "he had to be housed separately from all inmates at all times," he was informed that this restriction was not on his jail card and that, accordingly, he would not be segregated. *Id.* at *2. The plaintiff was soon thereafter involved in an assault with his inmate. *Id.* The Eleventh Circuit determined that a reasonable jury could conclude that the risk was substantial. *Id.* at *3.

Shadwrick relies on *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) to support his claim that he possessed only a generalized awareness of Reyes's violent history. He argues that his vague recollection of Reyes's past incidents does not "satisfy the subjective awareness requirement." *Carter*, 352 F.3d at 1350. In *Carter*, the plaintiff was placed in a cell with a high-security inmate, who informed the plaintiff that he intended to fake a hanging in order to

obtain a transfer and would require the plaintiff's assistance "one way or another." *Id.* at 1348. Though the plaintiff conveyed this information to prison officials, they took no action; subsequently, the plaintiff was stabbed in the stomach with a shank by his inmate. *Id.* The Eleventh Circuit concluded that, although the plaintiff's inmate "was a 'problem inmate' with a well-documented history of prison disobedience and had been prone to violence," the prison officials possessed only a "generalized awareness" of his propensity for violence and could not actually draw the inference that the inmate created a serious risk of harm to the plaintiff. *Id.* at 1349-50.

Carter differs from the facts of this case in two key ways. First, while the plaintiff's inmate in *Carter* had a record of violence and disturbances while incarcerated, "he had never previously assaulted a cellmate." *Id.* at 1348 n. 6. Second, while the plaintiff in *Carter* reported the inmate's faked hanging statement to the defendants, he did not make a request for protective custody. *Id.* at 1350. Thus, *Carter* actually supports denial of summary judgment as to Patton's deliberate indifference claim relating to his being placed in a cell with Reyes.

Shadwrick's reliance on *Goodman v. Kimbrough*, 718 F.3d 1325 (11th Cir. 2013) is similarly inapposite as to Patton's "placement with Reyes" claim but supports summary judgment as to Patton's claim based on a failure to totally

segregate him from all inmates. In *Goodman*, the court found that the jail's deactivation of call buttons and failure to conduct required cell checks was egregious but did not amount to more than either negligence or gross negligence because there was no evidence "indicating that the officers knew [the plaintiff] was in danger and, equipped with that knowledge, deliberately disregarded that risk." *Id.* at 1333. Further, there was no evidence before the Eleventh Circuit that the inmate who assaulted the detainee in *Goodman* had a prior history of violence. The court upheld the district court's determination that the plaintiff's deliberate indifference claim was not viable because, despite troubling evidence of the officers' dereliction of duty and policy deviations, a reasonable jury could not find that the defendants subjectively "*knew* of a substantial risk of serious harm" to the plaintiff. *Id.* at 1332 (emphasis in original).

> **i.**    ***Shadwrick's Failure To Totally Segregate Patton from all Other Inmates Did Not Rise to the Level of Deliberate Indifference***

Patton relies on ECDC policy to argue that Shadwrick acted with deliberate indifference by failing to totally and immediately segregate him. The ECDC policy on administrative segregation does not require that a prison guard verify the employment status of an arrestee who claims he is a member of law enforcement. Rather, the policy dictates that a detainee claiming protection as a law enforcement

29

officer may request segregation "whether or not there is official information to verify the claim." (Doc. 38-13 at 4). However, the policy also states,

> A written order shall be completed and approved by a supervisory officer before a detainee is placed in administrative segregation, except when exigent circumstances make this impracticable. In such cases, an order shall be prepared as soon as possible. A copy of this order shall be given to the detainee within 24 hours, unless delivery would jeopardize the safety, security, or orderly operation of the facility.

(Doc. 38-13 at 4). In an emergency, the detainee's placement in administrative segregation may precede the paperwork." (*Id.*).

Shadwrick argues that ECDC's policy on administrative segregation applies only to placement in the "general population" and does not apply in the context of a temporary holding cell. (Doc. 38 at 30). Although it is true that Shadwrick concedes that Patton informed him that he was a corrections officer for another correctional facility and could not be placed in general population, Patton cites no authority for the proposition that a prison guard possesses more than a "generalized awareness of risk" when incarcerating a correctional officer. Rather, the cases cited by Patton illustrate those facts which support a finding of specific awareness and those which do not. Further, Patton has not cited, nor has this court independently found, any authority abrogating – in the case of an incarcerated law enforcement officer – the Eleventh Circuit's holding that "a prison custodian is not

the guarantor of a prisoner's safety." *Purcell*, *op. cit.*, 400 F.3d at 1321 (internal

quotation marks and citation omitted).

Accordingly, a failure to totally segregate Patton amounted to no more than

a generalized[22] awareness of the risk, and the court finds that a reasonable jury

could not conclude that Shadwrick drew the inference that failing to totally

segregate Patton from all other inmates created a serious risk of substantial harm

to Patton. Therefore, the Motion for Summary Judgment is due to be **GRANTED**

as to Patton's claim that Shadwrick acted with deliberate indifference by not

totally segregating Patton from all other inmates.

> ii. *A Reasonable Jury Could Determine That Shadwrick's Placement of Patton in a Cell With Reyes Rose to the Level of Deliberate Indifference*

Patton's second deliberate indifference claim does not meet the same fate as

his first. Shadwrick had personal knowledge that Reyes had previously been

involved in inmate-on-inmate violence because he was a member of the SOD team

that responded to the incident on October 19, 2012, which occurred approximately

six months prior to the altercation with Patton. While Shadwrick claims he did not

remember the specifics of Reyes's prior history and past incidents, a reasonable

---

[22] After all, arguing that "all inmates in a detention center are dangerous to all incarcerated law enforcement" is about as general as a statement can be.

jury could infer from the evidence that his willingness to place another inmate in a cell with Reyes amounted to more than even gross negligence.[23]

Additionally, the parties dispute whether Shadwrick failed to take measures to prevent or mitigate the substantial risk. For example, they debate whether Shadwrick could have, even temporarily, placed Patton into the holding cell which was designated for female inmates rather than place him in a cell with Reyes. While Deputy Administrator Hassell's affidavit supports Shadwrick's statement that Holding cell 2 is reserved as a female holding cell, it is not clear to the court that this policy prevented Patton from being temporarily kept in that cell. It is also not clear whether there were other alternatives available to Shadwrick that would, unlike placing Patton in Holding cell 7 with Reyes, not have created a substantial risk of injury to Patton.

Ultimately, the question of Shadwrick's deliberate indifference does not turn on whether or not Beck instigated the violence between Patton and Reyes, particularly as there is insufficient evidence that Shadwrick was aware of any communication or hand signals between Beck and Holding cell 7. Beck's

---

[23] The court also notes that Reyes' violent history includes several instances where Reyes was discovered in possession of contraband, including a situation where Reyes harmed himself with a razor blade, causing a severe enough injury to require stitches. (Doc. 38-12 at 17-20). In the altercation between Patton and Reyes, contraband was yet again removed from the cell after the two inmates were separated. (Doc. 38-2 at 60:3-21).

involvement in and awareness of a potential altercation between Patton and Reyes also cannot be imputed to Shadwrick under a collective awareness theory. *See Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) ("As such, imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." )(citing *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)). Regardless of what prompted the altercation, the altercation would not have happened at all if Patton had not been placed by Shadwrick in a cell with Reyes, an inmate with a known-to-Shadwrick history of inmate-on-inmate violence.

Based on the evidence presented, Patton has shown that Shadwrick had more than "a generalized awareness of risk," *Carter*, 352 F.3d at 1349-50. Therefore, a jury could reasonably conclude that Patton faced a substantial risk of serious harm, determine that Shadwrick acted with deliberate indifference to that risk, and find that the necessary "causal link" existed between Shadwrick's actions and Patton's injury. Therefore, the Motion for Summary Judgment is due to be **DENIED** as to Patton's claim that Shadwrick acted with deliberate indifference in placing Patton in a cell with Reyes.

        **B.**     ***Shadwrick's Failure To Stop the Altercation Between Reyes and Patton Once It Began Did Not Rise to the Level of Deliberate***

### *Indifference*[24]

Patton further asserts that Shadwrick acted with deliberate indifference by failing to stop the altercation between Patton and Reyes once it began. However, the video evidence presented demonstrates that Shadwrick's actions after the assault began did not constitute deliberate indifference.

In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court emphasized that, at the summary judgment stage, facts must be viewed in the light most favorable to a nonmoving party only if there is a genuine dispute surrounding those facts. 550 U.S. at 380. Furthermore,

> "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Scott*, 550 U.S. at 380 (italicized emphasis in original; underline emphasis

---

[24]   In his reply brief, Shadwrick argues that Patton should have characterized his alleged failure to enter the holding cell and stop the altercation as a "failure to intervene" claim. (Doc. 46 at 5-6). As Patton has not presented his claim in this light, the court will assess his deliberate indifference claim in the manner chosen by Patton.

supplied).[25]

In his deposition, Patton testified that "as soon as the cell door closed, Reyes assaulted him." (Doc. 42 at 10, ¶ 47); (Doc. 38-3 at 41:10-12). Patton claims that Shadwrick admitted in his statement following the altercation that "he heard an argument between Patton and Reyes before the beating started." (Doc. 42 at 17). However, a close reading of Shadwrick's narrative summary of the incident does not reveal that Shadwrick was aware of any altercation between the two inmates that began *as soon as* the cell door closed. (Doc. 38-11 at 10). Instead, the summary, without going into detail regarding the time that passed between when the holding cell door closed and when the altercation began, merely states that Shadwrick and Officer Cook both heard a verbal argument and collectively stood to address the problem. *Id.*

While the video evidence does not show the attack itself, it does

---

[25] In *Scott v. Harris,* the Court considered whether an officer could take actions that place "a fleeing motorist at risk of injury or death in order to stop the motorist's flight from endangering the lives of innocent bystanders." 550 U.S. at 372. The plaintiff's testimony, which was taken as true during summary proceedings in the lower courts, argued that the plaintiff drove responsibly and presented no threat. *Id.* However, the defendant presented a video tape of the police chase that depicted the plaintiff driving inappropriately fast and endangering the lives of others. *Id.* On appeal, the Supreme Court held that, "with regard to the factual issue whether [the plaintiff] was driving in such fashion as to endanger human life," the plaintiff's "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380. Consequently, the lower courts "should not have relied on such visible fiction; [they] should have viewed the facts in the light depicted by the videotape." *Id.* at 380-81 (emphasis added).

demonstrate the almost simultaneous reaction by Shadwrick, Officer Cook, Beck, and Kicklighter *approximately two minutes* after Patton was placed in Holding cell 7. Starting approximately at 20:41:20 on all three jail cell videos, a commotion can be heard on the video. Almost simultaneously, Shadwrick and Officer Cook stand up and look in the direction of Holding cell 7. Shadwrick then called a "Code Red" within a few seconds of hearing the commotion. Viewing these facts in the light depicted by the videotape, Patton's version of events is blatantly contradicted; all four individuals in the booking room reacted almost simultaneously approximately two minutes *after* Patton was placed in the cell.

Further, the video evidence shows that Shadwrick acted with haste in calling the SOD team and giving them access to the booking room once they arrived. In response to Shadwrick's established facts that he quickly called a "Code Red" after the altercation began, Patton repeatedly asserts that "there is no specific 'code red' policy at the ECDC as it is merely an announcement used to let corrections personnel know that a physical altercation is in progress. The ECDC Policy and Procedure on Use of Force is the Official Policy."[26] (Doc. 42 at ¶¶ 48,

---

[26] At Section III, Subsection A, the ECDC Policy and Procedure on Use of Force states, "When a detainee acts violently or appears on the verge of violent actions, if necessary, staff shall use reasonable force and/or restraints to prevent him/her from harming self, others, and/or property." AAF No. 50; (Doc. 43-2 at 2).

49, 80, 84, 93). However, despite the fact that there was no written policy on calling a "Code Red," Detention Center Administrator Hassel's affidavit supports Shadwrick's contention that corrections officers are trained to call a Code Red when an altercation between inmates occurs so that the SOD team can appropriately respond. (Doc. 38-10 at 4-5, ¶¶ 24-29).

Patton does not dispute that Shadwrick called a "Code Red" within a few seconds after he stood up and looked toward Holding cell 7. Patton also does not dispute that, between the time that Shadwrick called the SOD team and when the team arrived, Shadwrick acted in three ways: he realized there was another inmate on the phone in the booking room and assisted other correctional officers in putting that inmate in a holding cell; he ran to the security door to let the SOD officers into the booking room; and, after letting the SOD team into the booking area, he rushed to meet the team at the door of Holding cell 7.

Additionally, Patton does not proffer any evidence disputing Shadwrick's testimony he properly followed his training - even if unwritten - by calling "Code Red" and then waiting for a properly-trained SOD team to respond.[27] Instead, Patton relies on Shadwrick's possession of pepper spray and the presence of

---

[27] The fact that Shadwrick was a member of the SOD team that responded to the October 19, 2012 incident between Reyes and another inmate bolsters Shadwrick's testimony that he received "Code Red" training. (Doc. 38-12 at 2-3).

Officer Cook to argue that Shadwrick violated the ECDC use of force policy by not acting when he had the means to do so. (Doc. 42 at 14). However, the ECDC policy does not mandate intervention under the circumstances present. (*See* Doc. 43-2 at 2)("An 'immediate-use-of-force' situation is created when a detainee's behavior constitutes a serious and immediate threat to self, staff, another detainee, property, or the security and orderly operation of the facility. In that situation, staff *may* respond without a supervisor's direction or presence.")(emphasis added).

Therefore, the court finds that no reasonable jury could conclude that Shadwrick acted with deliberate indifference in failing to stop the altercation - once it began - before the SOD team arrived. Accordingly, Shadwrick's Motion for Summary Judgment is due to be **GRANTED** as to this aspect of Patton's deliberate indifference claim. However, because the court also finds that a reasonable jury could conclude that Shadwrick acted with deliberate indifference in placing Patton in the holding cell with Reyes to begin with, Patton's deliberate indifference claim survives Shadwrick's Motion for Summary Judgment as to such placement.

### C.    Qualified Immunity

Because the court finds that factual issues preclude summary judgment in part, the remaining issue is whether, as of April 9, 2013, pre-existing law clearly

established that Shadwrick's conduct violated the Fourteenth Amendment. Out of an abundance of caution, the court will address this issue as to all of Patton's deliberate indifference claims.

### i.   *Legal Summary*

To receive qualified immunity, "the government official must first prove that he was acting within his discretionary authority." *Gonzalez v. Reno,* 325 F.3d 1228, 1234 (11th Cir. 2003). The plaintiff must then show that the law was clearly established that the defendant's acts rose to the level of deliberate indifference. *See Schmelz v. Monroe Cnty.*, 954 F.2d 1540, 1544 (11th Cir. 1992); *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997) ("[T]he qualified immunity standard is broad enough to cover some 'mistaken judgment'").

Here, it is clear that Shadwrick was acting within the scope of his discretionary authority. At the Motion To Dismiss stage, the parties did not dispute that Shadwrick was acting within his discretionary capacity. (*See* Doc. 27 at 9-10). However, Patton now argues that while Shadwrick had discretionary authority in responding to Patton's request for administrative segregation, he did not have discretionary authority "in how he responded when he became aware of Reyes' violent beating of Patton." (Doc. 42 at 12).

This argument is unavailing, particularly because Patton offers no basis for

challenging Shadwrick's conduct as non-discretionary in nature. "To determine whether an official was engaged in a discretionary function, [courts] consider whether the acts the official undertook 'are of a type that fell within the employee's job responsibilities.'" *Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (citing *Holloman ex rel. Holloman v. Harland*, 70 F.3d 1252, 1265 (11th Cir. 2004)). As Shadwrick's brief correctly states, Patton's claim arise from Shadwrick's duty as a correctional officer in fulfilling the sheriff's statutory duty to operate the jail. (Doc. 38 at 23 (citing Ala. Code § 14-6-1)).[28] Therefore, the court finds that Patton was at all relevant times acting within the scope of his discretionary authority as a corrections officer.

Accordingly, Patton bears the burden to show that Shadwrick is not entitled to qualified immunity. *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010); *see also Gonzalez v. Reno,* 325 F.3d 1228, 1234 (11th Cir. 2003) ("Once the defendants have established that they were acting within their discretionary authority, the burden shifts to the plaintiff[] to show that qualified

---

[28] Ala. Code § 14-6-1 states as follows: "The sheriff has the legal custody and charge of the jail in his or her county and all prisoners committed thereto, except in cases otherwise provided by law. The sheriff may employ persons to carry out his or her duty to operate the jail and supervise the inmates housed therein for whose acts he or she is civilly responsible. Persons so employed by the sheriff shall be acting for and under the direction and supervision of the sheriff and shall be entitled to the same immunities and legal protections granted to the sheriff under the general laws and the Constitution of Alabama of 1901, as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law."

immunity is not appropriate.").

To oppose qualified immunity, a plaintiff "must prove the existence of a clear, factually defined, well-recognized right of which a reasonable police officer should have known . . . *[t]he right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful*." *Barts v. Joyner*, 865 F.2d 1187, 1190 (11th Cir. 1989) (emphasis in original); *see also Santamorena v. Georgia Military College*, 147 F.3d 1337, 1340 (11th Cir. 1998) ("To overcome this immunity, Plaintiff has the burden of pointing to case law which 'pre-date[s] the offic[ial]'s alleged improper conduct, involve[s] materially similar facts, and 'truly compel[s]' the conclusion that the plaintiff had a right under federal law.'" (quoting *Ensley v. Soper*, 142 F.3d 1402, 1406 (11th Cir. 1998))).

Determining whether a right has been clearly established turns on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Cottone v. Jenne*, 326 F.3d 1352, 1359 (11th Cir. 2003) (quotation marks omitted). The determinative inquiry for the court is "whether the state of the law gave the [defendants] fair warning that their alleged conduct was unconstitutional." *Id.*

As the Eleventh Circuit recently explained,

41

a plaintiff can demonstrate that the contours of the allegedly violated constitutional right were clearly established in at least two ways. *Id.* at 1255. First, a plaintiff "may show that 'a materially similar case has already been decided.'" *Id.* (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)). Second, a plaintiff "can point to a 'broader, clearly established principle [that] should control the novel facts [of the] situation.'" *Id.* (quoting *Mercado*, 407 F.3d at 1159); *accord United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question."); *Hope*, 536 U.S. at 739, 122 S.Ct. 2508 (stating that a violation can be clearly established even absent a case "involving the [ ] action in question").

Here, the broader principle laid down in *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), "control[s] the novel facts" pleaded in Plaintiff's complaint. *See Castro v. Cty. of Los Angeles*, 797 F.3d 654, 664 (9th Cir. 2015) ("*Farmer* sets forth the contours of the right to be free from violence at the hands of other inmates with sufficient clarity to guide a reasonable officer."); *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007) (same). In short, the Supreme Court made clear in *Farmer* that prison officials have a duty "to protect prisoners from violence at the hands of other prisoners," *Farmer*, 511 U.S. at 833, 114 S.Ct. 1970, and that an official may be liable if he knows of and disregards a substantial risk of an inmate-on-inmate attack "by failing to take reasonable measures to abate [the risk]." *Id.* at 847, 114 S.Ct. 1970; see also *id.* at 837, 114 S.Ct. 1970.

*Miami Dade,* 2016 WL 4073246, at *6. The court in *Miami Dade* concluded that

as of May 2013, the time the events underlying the suit took place, "it was clearly

established that a prison official violates an inmate's constitutional rights where

the official is aware of a substantial risk of serious harm to an inmate, including an

inmate-on-inmate attack, and takes no action." *Id.* at *7.

ii.   ***Analysis***

Even if this court erred in finding that Patton failed to demonstrate that a reasonable jury could find Shadwrick acted with deliberate indifference by not totally segregating Patton from all other inmates, the law is not clearly established as to this claim. Indeed, as explained above, this court believes the law is to the contrary. Therefore, Shadwrick is entitled to qualified immunity as to Patton's claim that he should have been totally segregated from all inmates, and Shadwrick is entitled to summary judgment as to this claim on this independent and alternative basis.

Similarly, even if this court erred in finding that Patton failed to demonstrate that a reasonable jury could find Shadwrick acted with deliberate indifference by not intervening once the altercation between Patton and Reyes began, the law is not clearly established as to this claim. Indeed, as explained above, the court believes that the law contradicts this claim. Therefore, Shadwrick is entitled to qualified immunity as to Patton's claim that Shadwrick should have intervened in the altercation, and Shadwrick is entitled to summary judgment as to this claim on this independent and alternative basis.

However, Shadwrick's qualified immunity defense does not fare as well

against Patton's claim that Shadwrick acted with deliberate indifference by placing Patton in a cell with Reyes. The Eleventh Circuit has previously explained that a prison guard is not entitled to qualified immunity for violating a prisoner's constitutional rights if the guard "actually (objectively and subjectively) knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any action to investigate, mitigate, or monitor that substantial risk of serious harm." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1102 (11th Cir. 2014) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1358–60 (11th Cir. 2003)(finding a lack of supervision of known violent inmates, which led to inmate-on-inmate violence, constituted clearly established impermissible constitutional conduct); *see also Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1325 (11th Cir. 2016)(finding that as of March 2010, "the law of this Circuit, as expressed in *Cottone*, clearly established that the defendants' total failure to investigate–or take any other action to mitigate–the substantial risk of serious harm that [the cellmate] posed to [the plaintiff] constituted deliberate indifference to [the plaintiff's Fourteenth] amendment rights.")(internal citation omitted).

While the opinions in *Miami Dade*, *Caldwell*, and *Bowen* were handed down after April 9, 2013, and were therefore not clearly established law at the time of the altercation, the binding Eleventh Circuit authority of *Farmer*,

44

*Rodriguez*, and *Cottone* was established with sufficient clarity to guide Officer

Shadwrick. At the summary judgment stage of this litigation, based on the facts as

presented and analyzed in this opinion in the light most favorable to the plaintiff,

Shadwrick is not entitled to qualified immunity as to Patton's deliberate

indifference claim based on the inmate-on-inmate violence between Patton and

Reyes.

## V.    CONCLUSION

For the reasons explained above, Shadwrick's Motion for Summary

Judgment is **GRANTED IN PART** and **DENIED IN PART**. Shadwrick's Motion

is **GRANTED** as to Patton's deliberate indifference claim based on Patton's

failure to totally segregate Patton from all other inmates and as to Patton's

deliberate indifference claim based on Shadwrick's alleged failure to stop the

altercation between Patton and Reyes once it began. Shadwrick's Motion is

**DENIED** as to Patton's claim that Shadwrick acted with deliberate indifference in

placing Patton in a cell with Reyes. The case will be set for pretrial conference and

jury trial by subsequent notice.

**DONE** and **ORDERED** this the 13th of December, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge